**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

DAIVIONTAE TYRELL JOHNSON,

Plaintiff,

v.

MEGAN LEBERAK, ANN YORK, ALLISON PACH, KATARYNA KRAINYK, and TONYA WESNER,

Defendants.

Case No. 24-CV-149-JPS

**ORDER**

Plaintiff, Daviontae Tyrell Johnson, a prisoner, brings this action under 42 U.S.C. § 1983 pro se. ECF No. 1. On April 3, 2024, pursuant to 28 U.S.C. § 1915A, the Court screened his complaint and identified which claims may proceed. ECF No. 9. Plaintiff proceeds on an Eighth Amendment claim against Defendants Megan Leberak ("Leberak"), Ann York ("York"), Allison Pach ("Pach"),[1] Kataryna Krainyk ("Krainyk") (collectively the "nursing defendants"), and Tonya Wesner ("Wesner") for their deliberate indifference to Plaintiff's serious medical need. *Id.* at 5.

Now pending before the Court is Defendants' renewed motion for summary judgment. ECF No. 145. The motion is now fully briefed and ready for disposition. ECF Nos. 146, 171, 173. As described below, the Court will grant Defendants' motion for summary judgment and this case will be dismissed with prejudice.

[1]Defendants indicate that Allison Pach is also known as Hohenstern. ECF No. 149 at 1. For simplicity, the remainder of this order will refer to her only as Pach.

## 1. LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 2. FACTUAL BACKGROUND

The Court relieved the parties from its normal summary judgment procedures due to shown difficulty creating a joint set of undisputed facts. ECF No. 144 at 7. Defendants submitted proposed findings of fact with their motion. ECF No. 147. Plaintiff responded to Defendants' proposed facts with thirteen separate filings. ECF Nos. 154–167. The vast majority of these filings appear to be discovery related materials and do not respond to Defendants' proposed facts. One document, ECF No. 167, appears to be a direct response to Defendants' proposed facts and the Court considers Plaintiff's responses. However, many of Plaintiff's purported disputes are not supported by specific references to evidence, or the cited materials do not support the dispute. Given this, the Court will treat any such facts as

undisputed for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

Plaintiff also submitted additional proposed facts, ECF No. 168, and Defendants filed a response to Plaintiff's additional facts, ECF No. 174. Plaintiff's proposed findings are posed as a question and are not short paragraphs that are limited to one material fact. *See* Civ. L.R. 56((b)(2)(iii). The Court need not consider Plaintiff's proposed findings of fact because they violate the local rules. However, in light of Plaintiff's pro se status and for a more complete analysis on the merits, the Court has nonetheless addressed Plaintiff's purported factual disputes where appropriate. Thus, the following facts are from the parties' proposed findings of fact with all facts taken in the light most favorable to Plaintiff as the non-moving party.

### 2.1 Parties

During the times relevant to this case, Plaintiff was housed at Waupun Correctional Institution ("WCI"). Wesner was employed as an Advance Practice Nurse Prescriber ("APNP") at WCI during the times relevant to this case. Pach was employed as a Nurse Clinician 2 at WCI during the times relevant to this case. She held this position from October 2021 until May 31, 2024. York was employed as a Nurse Clinician 2 at WCI during the times relevant to this case. She held this position from April 2, 2007 until March 8, 2024. Krainyk was employed as a Nurse Clinician 2 at WCI during the times relevant to this case. She has held this position from October 18, 2022 until present. Leberak was employed as a Nurse Clinician 2 at WCI during the times relevant to this case. She held this position from December 2021 until June 2024.

### 2.2 General Healthcare Procedures at WCI

When an inmate has a non-emergency medical concern, wishes to communicate with medical staff, and/or requests to be seen by Health Services Unit ("HSU") staff, he fills out a Health Service Request ("HSR") form and submits it to the HSU. The HSRs are triaged by the nursing staff daily. The registered nurse uses their nursing training and judgment when triaging the HSRs and prioritizing appointments and inmate needs. A response generally indicates whether the inmate is scheduled to be seen; whether the HSR is referred to another staff member or referred for copies or a record review; or whether education materials are attached. The responder may also include written comments. Appointments with outside providers are scheduled with that provider, and inmate patients are subject to the availability of that provider just as the general population is. DOC providers are not required to follow the plan of care recommendations set forth by outside providers. DOC providers adapt the plan of care for DOC policies and procedures.

Nurses in the HSU (with some exceptions for APNPs) do not have the authority to override or alter orders issued by an advance care provider, nor do they have the ability to write prescriptions or refer inmates to outside specialists, surgeons, or physicians. Nurses in the HSU do not order surgeries or off-site procedures. Scheduling of off-site provider appointments is handled by designated HSU administrative staff (e.g., the Medical Program Assistant Associate ("MPAA")), subject to provider and transport availability. Nurses have the authority to provide interventions in accordance with nursing protocols if it is medically indicated. Appropriate interventions for pain that a nurse could provide would be ice therapy, activity restriction, ibuprofen, Tylenol, and education on PRICE

measures (protect, rest, ice, compression, and elevation). Nurses can also consult with an onsite/on-call provider 24/7; can conduct nursing assessment and nursing diagnosis; come up with and implement a plan of care; and finally evaluate a plan of care. It is the function of health care professionals/Advanced Care Providers ("ACP") employed in the HSU, in consultation with any necessary treatment providers outside of the institution, to provide medical diagnosis, care, and treatment for the inmates.

A consulting/outside physician may make recommendations concerning a course of treatment for an inmate. Such recommendations are made to the institution's treating provider. However, the institution's treating provider is not bound by the recommendations of the outside consulting physician and may adopt or reject any or all of the recommendations in light of the treatment provider's own medical judgment.

### 2.3 Care and Treatment of Plaintiff

On September 23, 2023, Plaintiff swallowed two razorblades and a handful of pills. Plaintiff was then taken to Waupun Memorial Hospital. According to medical records, Plaintiff was discharged from the hospital against medical advice and was returned to WCI on September 24, 2023. Plaintiff maintains that he was forced to leave the hospital due to staffing issues. ECF No. 167 at 3.

#### 2.3.1 Treatment for the Ingestion of Foreign Objects

Foreign bodies are generally monitored via an X-ray of the abdomen (KUB) and other diagnostics, unless found to be obstructing or other objective medical findings indicate a need for emergent removal. In general, when dealing with foreign object ingestion, a clinical pathway is

considered. If a patient reports swallowing a foreign body, an X-ray and/or metal detector may be used to diagnose the location of the object. Foreign bodies can also have their location identified by radiography diagnostics. Depending on the location and non-obstruction in an otherwise medically stable adult, observation may be allowed. Foreign bodies are generally monitored and left to pass naturally unless the foreign body is found to be causing obstruction inside the patient, or if there are other objective medical findings that indicate a need for emergent removal. If it is identified that the foreign object is lodged or not moving, surgical intervention may be used to remove the object. The size and location of the foreign object are also taken into consideration when formulating a treatment plan.

A generally accepted treatment plan in most cases is to allow the foreign object to pass naturally while monitoring the patient. This is because the natural course after ingestion of a foreign object is asymptomatic in 80% of cases, and the foreign object passes without problems. Endoscopic intervention is indicated in some 20% of cases. Surgery is required in less than 1% of cases. For most patients, ingested foreign bodies pass through the gastrointestinal tract without any difficulty. Conservative treatment by means of close observation is therefore justified in most cases. Plaintiff disagrees that this is appropriate treatment. ECF No. 167 at 5–7. Appointments with outside providers are scheduled with that provider, and inmate patients are subject to the availability of that provider, just as the general population is.

When monitoring foreign object ingestion, HSU staff closely monitor a patient's blood work (i.e. hemoglobin) and also look at the abdomen (KUB) to see whether there is an actual foreign object, where the foreign object is, the size of the foreign object, and how the vital signs of the patient

are to make sure that the patient is medically stable. Follow-up includes HSU staff taking a KUB X-ray again weeks later to see whether the foreign object is moving appropriately.

If the foreign object is not moving, HSU—with approval from the ACP—contacts general surgery and determines if there should be colonoscopy, and if the foreign object should be removed. HSU does not risk further harm to the patient if the foreign object is in a certain area and could cause more harm by surgical intervention, especially when the foreign object is going to move out naturally.

#### 2.3.2 Wesner's Plan of Care for Plaintiff

Wesner was not on-site at WCI on September 23, 2023 and September 24, 2023. After Plaintiff's ER visit for a foreign body ingestion, Wesner learned of Plaintiff's return to the institution. Wesner ordered Ibuprofen 200 mg for Plaintiff on September 24, 2023. Wesner ordered acetaminophen 325 mg for Plaintiff on September 29, 2023. Wesner reviewed the off-site documents from Plaintiff's trip to the hospital. The off-site provider recommended to "See Neuro - ASAP" and also to "Please call to schedule for FB [foreign body] removal." The hospital discharge paperwork noted that Plaintiff was discharged from the hospital against medical advice. Plaintiff maintains that he did not sign anything saying he did not want treatment. ECF No. 167 at 4.

Wesner ordered routine abdomen X-rays to monitor the movement of the foreign body in Plaintiff. Based upon Wesner's professional medical judgment and expertise, she believed Plaintiff's condition when he returned from the hospital was stable enough that watchful waiting and allowing the object to naturally pass was an appropriate initial plan of treatment. Plaintiff disputes this fact and points to a September 24, 2023

medical record. The records states, in relevant part, "General Surgery consulted and plan for Endoscopy." ECF No. 57-7 at 65. Plaintiff also relies on a September 25, 2023 nursing narrative that provides as follows: "PIOC was seen at WMH over the weekend and he left AMA. The surgeon wanted PIOC to be returned to WMH to have surgery because foreign bodies were present in the scans. Writer indicated that provider will be updated. Writer then spoke to LPN Hailey who indicated that APNP Wesner is aware and a decision has been made to allow items to pass naturally. LPN Hailey then indicated that she will return a phone call to general sx." ECF No. 157-6 at 65.

An abdomen X-ray from November 13, 2023 found occult blood positive findings after the prior X-ray was negative. The medical records noted possible re- swallowing of a foreign body. On November 15, 2023, Krainyk saw Plaintiff to test his vital signs and for an abdominal assessment post razor ingestion. On November 16, 2023, York responded to Plaintiff's HSR requesting copies of his October 21, 2023 assessment and November 11, 2023 stool result and followed up on his pain by stating that the colonoscopy was scheduled and by providing the requested copies. On November 16, 2023, Plaintiff had a colonoscopy diagnostic procedure at Waupun Memorial Hospital. The results came back normal, and nothing was removed. This appointment was scheduled based on Dr. Karen Reynolds' availability. The foreign body (razor) ultimately naturally passed through Plaintiff's system as predicted.

#### 2.3.3 York's Involvement with Plaintiff's Care

York was not on-site on September 23, 2023 and September 24, 2023. York saw Plaintiff on September 27, 2023 in RHU exam room with security for his chief complaint of abdominal pain and inability to void. She noted

that Plaintiff had been to the hospital the previous weekend for ingestion of razors and pills. She also noted that Plaintiff would try to give UA sample. She encouraged him to drink water and try to void. York further noted that his subjective statements did not match the objective findings. She also noted that Plaintiff had an order for an abdominal X-ray to track the movement of the foreign bodies he had ingested.

On September 28, 2023, York made a note that Plaintiff submitted an unwitnessed urine sample, which appeared pink, clear with hint of red cloudy tissue at the bottom of the sample. She further noted that blood was largest amount on the strip, but otherwise it was a negative sample and that a follow-up by a nurse would be scheduled on the morning shift.

York responded to Plaintiff's October 20, 2023 HSR related to his complaint of why he had not gotten surgery or treatment related to his September 23, 2023 hospital visit. She mentioned that nurse appointments are scheduled to monitor him and progressive X-rays were scheduled to see if the object was moving through his gastrointestinal tract.

York responded to Plaintiff's October 24, 2023 HSRs asking for the results of his October 23, 2023 X-ray. She noted that it was a negative study, and that a foreign body was no longer demonstrated. The other HSR complained of coughing blood and chest pain, to which York noted that it was addressed and seen by a nurse on October 24, 2023. In other words, according to the results of October 23, 2023 X-ray, the razors were no longer present on that date. York responded to Plaintiff's October 25, 2023 HSR complaining about blood coming out of stool. She noted that he was seen by a nurse on October 24, 2023, and asked Plaintiff if he got a cup to provide a stool sample to check for occult blood. York responded to Plaintiff's November 14, 2023 HSR asking for copies of his November 11, 2023 stool

results and follow up for his pain. She noted that a colonoscopy was scheduled and enclosed the copies requested. For each of the instances that York responded to Plaintiff's HSRs, she did not physically meet with him. Rather, she answered his questions based on her review of his medical file.

#### 2.3.4 Pach's Involvement with Plaintiff's Care

Pach was not on-site when Plaintiff was sent out to the ER or when he returned on September 23, 2023 and September 24, 2023. On September 25, 2023, according to the nursing protocol, Ibuprofen was brought to RHU for Plaintiff. On October 16, 2023, Pach made a note regarding HSU cancelling his follow-up appointment due to his behavior and refusal to comply with security request. Plaintiff was in holding cell refusing to comply with a security and upset that his cell was being searched. Plaintiff was placed on observation at that time. He was alert and oriented at that time. He appeared to be in NAD, breathing equal and unlabored.

Per nursing referral review, this appointment was to complete a vitals check and was part of an every other day assessment for one week regarding the foreign body ingestion prior to his X-ray completion. On October 20, 2023, Pach saw Plaintiff as part of every other day RN assessment due to his foreign body ingestion. At this time, Plaintiff was being seen by HSU every other day. However, she was not the nurse that saw him every time. She wrote in her assessment that his status was unremarkable. Though Plaintiff verbally complained about pain with palpation to left upper quadrant, when she placed stethoscope by pressuring into LUQ, there appeared no pain. He had an upcoming X-ray to check for the placement of the foreign body to see if it had moved. Plaintiff was aware, verbalized understanding, and would notify HSU of new or worsening symptoms.

On November 3, 2023, Pach saw Plaintiff regarding his HSR complaint of stomach and chest pain, stating he continues with intermittent abdominal pain in the LLQ. He rated the pain as 8/10. He also stated that eating worsens the pain, and nothing seemed to make it better. She noted that Plaintiff still had not collected and returned a stool to the HSU and had been given multiple sample kits to collect. His vitals were stable and his assessment was unremarkable, aside from a complaint of LLQ pain. Pach noted mild grimacing during palpation, and no bloody stools were witnessed. Plaintiff verbalized understanding of copay policy. Pach further noted to verify pantoprazole was on officer cart, gave another kit to collect stool, and educated on the importance of completing the test. Plaintiff verbalized understanding and agreed with the plan of care, and would notify the HSU of new or worsening of symptoms. Plaintiff had been given multiple other stool testing kits and did not complete them. He was aware that the stool testing kits needed to be completed to move forward with further testing, as orders would be based on results. The HSU staff had spoken multiple times to Plaintiff regarding this issue.

On November 8, 2023, Pach sent a general message to Wesner stating that Plaintiff's stool sample was obtained on Monday and labs resulted as "Occult stool is positive. H. Pylori negative." Wesner responded by stating that "yes, a repeat stool was ordered". Based on this, Pach's understanding was that the ACP determined that additional testing was needed.

**2.3.5 Leberak's Involvement with Plaintiff's Care**

Leberak was on-site on September 23, 2023 and September 24, 2023. On September 23, 2023, Leberak saw Plaintiff, who reported ingestion of two razors and a handful of assorted pills/capsules. She noted that this was partially witnessed by staff, and it could not be determined if Plaintiff did

or did not take the pills or swallow the razors. Plaintiff went to the Waupun Memorial Hospital ER. On September 24, 2023, Leberak checked Plaintiff in from his offsite visit at about 10:36 a.m. On the same day, at about 3:30 p.m., Leberak saw Plaintiff for his complaint of spitting up blood. She noted that there were scant blood streaks in spit noted on the floor. She notified the physician on-call and ordered Ibuprofen for pain. She asked Plaintiff to contact the HSU if his condition worsened or persisted. Plaintiff verbalized understanding and agreed to the plan of care. Since Leberak referred this issue to the physician on-call, the decision on what to do next for Plaintiff would have been up to the ACP who received the referral.

On October 7, 2023, at about 8:33 a.m. Leberak saw Plaintiff for self-harm. Security notified Leberak that staff witnessed Plaintiff taking seven tablets, white and round in shape, and that Plaintiff had self-harmed. Plaintiff stated that he took Tylenol. Plaintiff confirmed that they were the most recent prescription that he had for Tylenol, which was 325mg tabs. Plaintiff refused wound care and vitals. Plaintiff stated that he would continue to self-harm no matter what was done for him. Leberak attempted to speak with him about what was going on, but he refused to talk on this matter. Plaintiff also stated that he was done talking with the PSU and his mind was not going to be changed. The on-call provider was contacted and agreed to monitor Plaintiff at that time. Plaintiff was informed to contact the HSU if he changed his mind and wanted wound care or vitals. Plaintiff verbalized understanding, but stated that he was not going to ask for care ever again. The on call-provider requested liver function labs to be drawn on October 9. The lab was notified of this request. On the same day, Leberak did three restraint checks on Plaintiff at about 9:11 a.m., 1:28 p.m., and 5:25 p.m. During his 9:11 a.m. and 1:28 p.m. checks, Plaintiff refused vitals.

Leberak completed circulation checks. At his 5:25 p.m. check, Plaintiff stated that he was not going to urinate for the whole time that he was strapped down. Plaintiff inquired how long it would take before holding his urine started to cause damage. Leberak said that it depends on fluid intake and bladder size. She educated Plaintiff to use the urinal, but he refused.

On October 21, 2023, Leberak saw Plaintiff for his abdominal stomach pain and spitting up blood. He reported pain in his lower upper quadrant. Plaintiff brought a milk carton to the appointment that contained spit that was tinged with red blood. The assessment otherwise was unremarkable. An X-ray was previously ordered per the provider during the week when Leberak was not on shift, and Plaintiff was already scheduled for the coming Monday to assess the foreign body that was present on the last X-ray.

Plaintiff inquired when the foreign body would be removed surgically if it had not moved yet. Leberak informed Plaintiff that an X-ray had been scheduled and that the provider would have to make a decision depending on what the X-ray showed. Plaintiff agreed to wait for the X-ray. Leberak informed Plaintiff to contact the HSU if his condition worsened or persisted. Plaintiff verbalized understanding and agreed with the plan of care.

#### 2.3.6 Krainyk's Involvement with Plaintiff's Care

Krainyk was not on-site on September 23, 2023 and September 24, 2023. On September 29, 2023, Krainyk saw Plaintiff to follow up on hematuria and abdominal pain. Plaintiff stated that he swallowed two razors on September 23, 2023, and was experiencing abdominal pain of 10/10 at the upper lower quadrant, throbbing and burning and it did not

radiate. Krainyk documented that Plaintiff had been referred to see the provider. Nursing does not schedule for provider's schedules, so Krainyk did not know how long it would be before he saw the provider when she met with Plaintiff.

The recommendation after Plaintiff's hospital visit had been to follow up with the provider for abdominal pain and noted that Plaintiff had a KUM (Kidney, Ureters, Bladder X-ray), scheduled. These are commonly ordered by providers to visualize ingested foreign objects. Plaintiff denied the possibility of STD (Sexually Transmitted Disease), burning with urination, foul odor to urine, retention, and urgency. Plaintiff's leukocytes were negative in the recent urine analysis. Krainyk noted that a UTI (urinary tract infection) was unlikely. Plaintiff stated that he believed he was urinating with blood because of swallowing razors. Krainyk educated Plaintiff that an occult stool sample was ordered and encouraged him to provide a sample when possible. Krainyk ordered nurse protocol APAP for abdominal discomfort and instructed on its use. DOC registered nurses had standing orders for Acetaminophen 650 mg 4 times a day for three days that can be utilized in applicable cases. Plaintiff acknowledged the plan of care and that he would notify the HSU with further concerns. No objective signs of pain were noted by Krainyk during the assessment. However, knowing that pain is subjective and not always visible, Krainyk still ordered nurse protocol Acetaminophen 650 mg 4 times a day for three days in an attempt to relieve Plaintiff's pain.

On October 5, 2023, Krainyk saw Plaintiff regarding his HSR complaint of hematuria, blood in stool, and blood in sputum. She noted that he was seen last week for this. She noted non-diaphoretic, acyanotic, appeared in NAD, calm and cooperative. Plaintiff's skin did not have

perspiration, his lips fingernails/ fingertips/ toes/ tongue were not blue, and he appeared in no acute distress. Plaintiff was calm and cooperative. These observations supported a generally stable clinical presentation. At this appointment, Krainyk re-educated him on the plan of care as discussed during the last nurse assessment. Plaintiff said he had a fever. Krainyk informed him that his temperature taken orally was within normal parameters. Further, she educated Plaintiff to inform the HSU of any new or changing symptoms. Plaintiff acknowledged the plan of care and said that he would write to the HSU with further concerns.

On October 23, 2023, a security staff member asked HSU staff if Plaintiff was on the nursing list for the day. Krainyk advised the sergeant that nursing visits had been discontinued. An observation officer notified Krainyk that Plaintiff complained of spitting up blood. She educated him that the most recent imaging for Plaintiff was negative for razor blades and asked if there was any other reason he would be spitting up blood. Plaintiff stated no and refused assessment. Plaintiff was in OBS status and could not sign the refusal. Officer Harmon witnessed this interaction. An X-ray concentrating on areas where razor blades could be stuck along the alimentary tract showed no razor blades were present at the time of the imaging. Krainyk therefore believed Plaintiff's concerns for spitting up blood could likely not be attributed to swallowing razor blades twelve days earlier. Krainyk had no way of knowing when the razor blades were passed due to vastly differing viables on metabolic rate, peristalsis, the movement of the stomach (which can be influenced by food/ movement/ many other factors), and Plaintiff's bathroom habits.

On October 24, 2023, Krainyk saw Plaintiff regarding his HSR complaining of spitting up blood, headache, and stomach burning.

Regarding his headache, she advised him to consume at least forty-eight ounces of water daily to maintain hydration, ensure adequate rest and sleep, and found no gross abnormalities upon palpation. For his stomach burning sensation, Plaintiff stated he had ulcer pain for which he used Pantoprazole. He further stated: "It's not ulcer pain it's a different pain." Krainyk advised him to try Pantoprazole for abdominal pain. Pantoprazole is a proton pump inhibitor. It works to decrease stomach acid, therefore reducing pain caused by the acid in the abdominal region.

On November 2, 2023, Krainyk saw Plaintiff, as he wanted to be seen for bloody bowl movements, pounding headache, stomach pain, and chest pain. Plaintiff stated, "Man, it's the same thing I been seein' for." Krainyk asked him if he still wished to be seen. He responded, "Man! You gotta see me!" Krainyk then calmly attempted to explain to him that the situation was escalating quickly and if it continued to do so, his appointment would be ended. Plaintiff responded by stating: "You know what, [f*ck] you. Forget this, [f*ck] this." Plaintiff stood and exited the room; Plaintiff was escorted by Officer Zilke and refused to sign the DOC 3220 refusal form.

On November 15, 2023, Krainyk saw Plaintiff, checking his vital signs and abdominal assessment post razor ingestion. She noted non-diaphoretic, acyanotic, calm and cooperative with no objective signs of pain like grimacing, guarding, crying, frowning, withdrawing. She noticed tender palpation in upper lower quadrant, reported 10/10 pain, throbbing/ burning. Plaintiff did not report nausea or vomiting. He was able to tolerate food and water but did express that pain was worse with eating. Plaintiff reported that his last bowl movement was on November 11, 2023 and that he lately had four to five days between bowl movements which is not baseline. When Krainyk asked about the color and consistency, Plaintiff

stated, “I don’t know, I don’t look.” Krainyk noted that there were negative X-rays on October 23, 2023 and November 13, 2023. This meant that the X-rays did not show any razors inside of Plaintiff on these dates. She further noted that Plaintiff had bowel prep that day and would monitor gross bleeding and that he would notify the HSU with further concerns and identified where the call button was. On November 16, 2023, Krainyk noted Plaintiff’s nurse appointment was cancelled due to a negative X-ray, labs being within parameters, and a negative exploratory colonoscopy.

#### 2.3.7 Updated Care and Treatment as of January 2025

Wesner became Plaintiff’s ACP as of January 2025. Since the September 2023 incident that this lawsuit concerns, Plaintiff continued to swallow razor blades or other foreign objections on different occasions. Inmates cannot choose the provider they want to be treated by at the institution. When an inmate arrives to the institution, during the intake process they are assigned to a provider based on their last digit of the DOC number. Wesner is assigned to all inmates who have a last digit of 0, 2, 4, 6 and 8 of the DOC number. On September 10, 2024, Wesner saw Plaintiff for a complete history and physical (“H & P”) procedure and cleared him medically to proceed with a colonoscopy.

On October 15, 2024, Wesner saw Plaintiff at the exam room at Segregation Unit for self-harm. She noted two lacerations on the left arm that required suture. When she asked for his name and number, he stated: “you know who I am [b*tch], don’t play that game. You know me.” A nurse had to tell Wesner his name. Plaintiff further stated that “you also know what I did with the razor, I swallowed it.” Wesner checked his oral cavity, and there were no cuts, razor, or bleeding. Though his lacerations on his arms were not actively bleeding, they were deep and required suture. When

Wesner told him that she would suture his left arm, he continued yelling loudly at the officers. At this point, she then realized that Plaintiff currently had an active lawsuit against her. At this October 15, 2024 visit, Wesner also noted that Plaintiff continuously self-harms and swallows the razors that he uses to cut himself. When she asked a question, he yelled loudly. She asked who witnessed the swallowing of the razor. He yelled at the security officer, "the observer, don't play games." He was stable other than behavioral and the two lacerations on this left arm which required sutures.

Since there was no imaging staff available at the institution at that time, Wesner told Nurse Matt to send Plaintiff to the local ER for medical imaging to locate suggested observed razor swallowed for evidence and location. She noted that while he was out for this treatment, the two lacerations on the left arm could be sutured as well. She also recommended upon Plaintiff's arrival that PSU and security communicate for restraint related to self-harm intentions. On October 16, 2024, Wesner reviewed his documents post the ER visit. The plan was to repeat abdominal X-rays to follow the foreign body location passage, Miralax to aid in passage of the foreign body and prevent constipation, and increase water intake; further, Wesner would monitor serial X-rays for location of foreign body movement, and noted that the stool OB was ordered and pending and that Plaintiff had a general surgery consult pending for EGD/colonoscopy.

On October 21, 2024, Wesner reviewed Plaintiff's abdominal X-ray and found it to be normal with no evidence of a foreign body present. On November 27, 2024, Wesner wrote a letter to Plaintiff based on his lab results to increase his water intake. On December 9, 2024, Wesner reviewed the recommendation of general surgeon Reynolds to allow the objects to pass and an order of CR of abdominal /pelvis. Miralax was prescribed for

constipation and to aid in passing of small foreign body in lower GI. There were no surgical interventions recommended at that time.

On December 10, 2024, Wesner saw Plaintiff at RHU wet/strip cell and explained the plan of care for his complaints of vomiting, treatment of UT infection, and ingestion of foreign object movement. When Plaintiff complained about peeing blood, Wesner explained to him that his urinalysis was positive for nitrates with a pink color. She also educated him that general surgery was once again consulted with his most recent foreign object ingestion, and that the progression of the foreign object was not only viewed through X-ray but by CT as well; general surgery gave direction to monitor and allow the object to pass and had no indication to proceed with surgical intervention at that time. She told Plaintiff that MiraLAX could help with the passage of a foreign body. Plaintiff said he was not interested in using the MiraLAX. Wesner encouraged him to follow the plan of care, not to ingest foreign objects, and to notify the HSU with questions.

Wesner ordered approximately eight abdominal X-rays within a span of six months between August 2024 to January 2025 to monitor Plaintiff's foreign bodies' movement. During this time, Wesner consulted with outside doctors and specialists outside of the DOC, and they also recommended "watchful waiting" and letting the objects pass naturally. Wesner saw Plaintiff approximately three times within a span of six months between August 2024 to January 2025 for his abdominal complaint related to foreign body ingestions. She had reviewed his documents post-ER visit and his abdominal X-ray reports, sorted and reviewed the recommendation of a general surgeon, wrote a letter to Plaintiff regarding an increased intake of water, etc. Based upon Wesner's professional medical judgment and expertise, all policies and protocols had been followed, and she would not

have changed anything in the way she provided care and treatment of Plaintiff. Based on Wesner's professional medical judgment and experience, she believes Plaintiff is currently receiving adequate medical treatment for his condition. Plaintiff's plan of care was in accordance with the community health care standards, the Wisconsin Department of Corrections' Chronic Pain Guidelines, and national guidelines.

Throughout the nurses' limited involvement with Plaintiff, they followed the plan of care established by the treating provider. The nurses had no authority to order surgery, prescribe different medications, or send Plaintiff off-site without a provider order, and they did not attempt to override any provider decision. Based upon the nurses' professional judgment and expertise, Plaintiff was provided with appropriate medical care for his foreign body ingestion and was not denied medical care resulting in further injury or infliction of pain. They had no reason to believe that Wesner's plan of care was inadequate or that Plaintiff was being ignored. As far as the nurses could tell, Plaintiff was seen by HSU for his condition frequently and was given plenty of follow-up care. During the nurses' contacts with Plaintiff detailed above, the nurses did not observe signs of acute distress or an emergency medical condition which would have required immediate emergency transfer under nursing protocols. Had they observed such signs, they would have immediately escalated to the on-call provider or initiated emergency transfer to the hospital consistent with HSU protocols. Their documentation shows that Plaintiff's condition was stable at the times that they saw him. The nurses' medical record entries were made at or near the time of the events described, in the ordinary course of HSU operations. To their knowledge, the EMR accurately reflects their notes and actions during the relevant time period.

Plaintiff's plan of care was in accordance with the community health care standards, the Wisconsin Department of Corrections' Chronic Pain Guidelines, and national guidelines. The nurses' involvement with Plaintiff was limited and appropriate to their nursing role. They lacked authority to prescribe medications, order off-site procedures, or alter the provider's plan of care. They did not observe emergent signs during their encounters that would have required immediate escalation or transfer, and they reasonably relied on the treating provider's clinical judgment.

## 3. ANALYSIS

Defendants brought a motion for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate inference to Plaintiff's serious medical need. ECF No. 146. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motion for summary judgment and will dismiss this case with prejudice.

### 3.1 Eighth Amendment Standard

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder,* 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional


Case 2:24-cv-00149-JPS Filed 09/25/26 Page 22 of 33 Document 179

mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662. The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment

claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties,* 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### 3.2 Analysis

First, Defendants do not argue that Plaintiff did not have an objectively serious medical need for treatment related to swallowing a razor blade and accompanying pain. ECF No. 146. Chronic pain may constitute an objectively serious medical condition. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (treating a hernia and chronic pain it caused as separate medical conditions). As such, the Court finds that Plaintiff has satisfied the first prong of the deliberate indifference standard.

Second, the Court finds that no reasonable juror could find that any defendant was deliberately indifferent to Plaintiff's need for treatment. The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Federal courts will not

interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe,* 631 F.3d at 857; *Sain,* 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya,* 836 F.3d at 805 (emphasis in original).

The Court begins with Wesner as the most involved defendant in Plaintiff's care. Based on the undisputed facts, the Court finds that no reasonable jury could find that Wesner was deliberately indifferent to Plaintiff's medical needs. The Court views Wesner's actions in two different categories: (1) her decision to pursue conservative treatment instead of returning Plaintiff to the hospital for removal of the razorblade; and (2) her decisions regarding Plaintiff's pain management.

The record does not support a finding of deliberate indifference based on Wesner's plan of conservative treatment. Wesner explained that she believed, based on her professional medical judgement and expertise, that Plaintiff's condition when he returned from the hospital was stable enough such that watchful waiting and allowing the object to pass naturally was an appropriate initial plan of treatment. ECF No. 147 at 6. Plaintiff has produced no evidence to show that no minimally competent medical professional would have made this decision. *See Lisle v. Eovaldi*, No. 16-CV-00422-NJR, 2020 WL 1287947, at *4 (S.D. Ill. Mar. 18, 2020) (finding no deliberate indifference where a plaintiff failed to produce "any evidence to

suggest that [doctor defendant's] determination to treat him through observation in the infirmary by taking his vitals and a series of X-rays or to discharge him from the infirmary to pass the razor naturally was a substantial departure from accepted professional judgment or the standard of care for the ingestion of foreign objects"). Plaintiff initially takes issue with the fact that he was released from the hospital period. *See* ECF No. 169 at 2. However, this argument is a non-starter because the record does not reflect that Wesner (or any other defendants) were personally involved in Plaintiff's discharge from the hospital. Instead, Wesner was not on-site the day Plaintiff was discharged from the hospital and learned of his return to WCI.

Next, Plaintiff takes issue with Wesner's treatment decisions in light of the hospital discharge paperwork that recommended he see Neuro "ASAP" and to "Please call to schedule [foreign body] removal." ECF No. 57-7 at 62. Plaintiff argues that Defendants were deliberately indifferent to his serious medical needs because they failed to follow this recommendation from the hospital medical providers. Although Plaintiff correctly points out that a defendant's decision to ignore a specialist's orders can imply deliberate indifference, *see Gil v. Reed*, 381 F.3d 649, 662–64 (7th Cir.2004), he has presented no evidence to raise such an implication here. In *Gil,* the court concluded that deliberate indifference could be inferred where a prison doctor canceled a specialist's prescriptions and substituted medication that the specialist had specifically warned was dangerous for persons with the plaintiff's condition. *Id.* at 664. In contrast, here, Plaintiff has failed to show that Wesner's decisions were based off of anything other than medical judgment. To begin, the Court cannot decipher from this document whether the physician who wrote this recommendation

was indeed a specialist with more knowledge in this area than Wesner. Further, the recommendation is not specific and does not indicate that the removal of the razor needed to happen urgently or the risks if it was not removed through surgery. Wesner ordered routine abdomen X-rays to monitor the movement of the foreign body in Plaintiff. Plaintiff argues that he was in serious risk of infection and should have been sent to the hospital immediately; however, Plaintiff is not a medical provider and has provided no basis for him to assert this conclusion as a lay person. *See Walker v. Zunker*, 30 Fed. App'x 625, 628 (7th Cir. 2002) ("Without any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact.") (citing *Walker v. National Recovery, Inc.*, 200 F.3d 500, 503 (7th Cir. 1999)). The record as it stands shows nothing more than a disagreement between medical providers about the proper course of treatment. The Court therefore finds that Wesner's failure to follow this recommendation did not rise to the level of deliberate indifference.

Finally, Plaintiff points to the September 25, 2023 nursing narrative indicating that the surgeon from the hospital wanted Plaintiff to be returned from the hospital. *See* ECF No. 157-6 at 65. Defendants argue that this record cannot be considered because it is inadmissible hearsay. ECF No. 173 at 6. Defendants acknowledge that the medical note itself may be admissible as a business record; however, they argue that the "embedded assertion from the outside surgeon is a separate out-of-court statement offered for its truth and is therefore hearsay within hearsay." *Id.* "To be considered on summary judgment, evidence must be admissible at trial, .... If the evidence is inadmissible hearsay, the courts may not consider it. And when a document contains multiple layers of hearsay, ... each layer must be

admissible." *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (cleaned up). The Court agrees with Defendants that the surgeon's assertion appears to be inadmissible hearsay. *See Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) ("No exception to the hearsay rule operates to permit admission of Mr. Boyce's cellmate's repetition of the statement. Consequently, the statement is inadmissible and may not be considered in determining the correctness of the grant of summary judgment.").

However, even if the Court does consider this evidence, the Court still does not find this to be the smoking gun piece of evidence that Plaintiff believes it to be. Even assuming that the surgeon made this statement, this evidence still shows only a disagreement between medical providers about the proper course of treatment. The narrative provides extremely limited information. Moreover, the narrative indicates that Wesner was aware of the recommendation, considered it, and instead chose a different course of treatment. Again, Plaintiff has provided no evidence to show that a reasonable medical professional would not have made a similar decision. Additionally, the record also reflects that Wesner consulted with outside doctors and specialists outside of DOC, who similarly recommended "watchful waiting" to let foreign bodies pass naturally months later when Plaintiff continued to ingest foreign bodies. *See* ECF No. 147 at 23. Without more, the Court therefore does not find that this evidence shows that Wesner's treatment decisions for Plaintiff rose to the level of deliberate indifference.

Similarly, the Court does not find that Wesner's treatment of Plaintiff's pain rose to the level of deliberate indifference. The record reflects that Wesner ordered Ibuprofen 200 mg for Plaintiff on September 24, 2023. Wesner then increased the pain medication and ordered

acetaminophen 325 mg for Plaintiff on September 29, 2023, presumably to address Plaintiff's pain concerns. Plaintiff generally asserts that he was "not given pain medication at all for the pain," ECF No. 171 at 4; however, he has not addressed any of Defendants' specific facts indicating that pain medication was prescribed on numerous occasions to address Plaintiff's pain. Further, he does not provide any facts suggesting Wesner was aware of the alleged fact that Plaintiff was not receiving his medications or that the prescribed medications were insufficient for Plaintiff's pain. Plaintiff's general assertions that he "did not receive" the prescribed medications are insufficient to show that *these* defendants were personally involved in denying Plaintiff adequate pain medications. Plaintiff has not provided any facts refuting Defendants' facts showing that they prescribed pain medications to address Plaintiff's concerns.

On these facts, the Court cannot say that Wesner was deliberately indifferent to Plaintiff's pain. "[T]he Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citation omitted). As the Seventh Circuit has articulated, "[t]here are many reasons for doctors to tread carefully when prescribing strong pain medications." *Id.* Plaintiff has not shown any facts to suggest that Wesner "persisted in a course of treatment known to be ineffective." *See Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020). Instead, the Court finds the record shows the opposite, as Wesner initially altered Plaintiff's treatment in response to his complaints of pain. Additionally, Plaintiff's treatment was further hindered by the fact that he used medications to self-harm, and Defendants likely had good reason to proceed with caution in

addressing Plaintiff's pain. As such, the Court does not find that Wesner's pain medication decisions rose to the level of deliberate indifference.

In sum, the Court finds that the record does not support a finding of deliberate indifference against Wesner. The question before the Court is not whether Wesner made perfect decisions regarding Plaintiff's care; indeed, the Court does not have the answer to that question because it has no medical expertise. Instead, the question is whether Wesner's treatment rose to the level of deliberate indifference. Based on the record before it, the Court finds that no reasonable juror could find Wesner acted with deliberate indifference to Plaintiff's medical needs. As such, the Court will accordingly grant Defendants' summary judgment motion as to Wesner.

For largely the same reasons, the Court similarly finds that no reasonable juror could find that the remaining nursing defendants—Leberak, York, Pach, and Krainyk—acted with deliberate indifference to Plaintiff's medical needs. As indicated above, these defendants were nurses at the relevant time period and had limited authority to disagree with Wesner's medical decisions or to prescribe medications. As discussed above, Plaintiff has presented no evidence suggesting that the decision not to return Plaintiff to the hospital for surgery rose to the level of deliberate indifference. Plaintiff was seen by medical staff regularly following his return from the hospital and at some points was being seen by the HSU every day. The nursing defendants saw Plaintiff on sporadic occasions with other providers seeing him in the interim. The record reflects that the nursing defendants consulted Wesner at various points about Plaintiff's care and provided the pain medications they were authorized to provide. As such, even assuming the nursing defendants could have overridden the

decisions, these defendants' deference to Wesner's decisions would similarly not amount to deliberate indifference.

Finally, the Court will grant summary judgment as to the nursing defendants for an additional reason. Notably, these defendants are not mentioned once in Plaintiff's opposition brief except for a brief mention that he told Leberak on one occasion that Tylenol was not on the medication cart. *See* ECF No. 106. The undisputed facts establish that these defendants were minimally involved in Plaintiff's care, and that in their nursing roles, they could not override treatment and medication decisions of Plaintiff's primary care providers. As the Court concluded above, Plaintiff's general assertions that he did not receive his prescribed pain medication do not show that these defendants were personally involved or aware that he was not receiving his medication. The nursing defendants physically examined Plaintiff at various times and attempted to address his pain issues. Although Plaintiff disagreed with the treatment he received and its effectiveness, this is insufficient to meet the high burden of deliberate indifference. Plaintiff has provided no evidence to show that no minimally competent professional would have so responded under those circumstances.'" *See Sain*, 512 F.3d at 894–95. Even if Plaintiff is correct that Defendants should have prescribed him additional pain medication or treatments, negligence is insufficient to meet the high deliberate indifference standard. As such, the Court finds that no reasonable jury could find that Leberak, York, Pach, and Krainyk were deliberately

indifferent to Plaintiff's serious medical needs. The Court will accordingly grant summary judgment as to Leberak, York, Pach, and Krainyk.[2]

## 4. CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment in full and will accordingly dismiss this action with prejudice. The Court has carefully reviewed the record and finds that Defendants are entitled to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Defendants' renewed motion for summary judgment, ECF No. 145, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

[2]Defendants also moved for summary judgment based on qualified immunity. ECF No. 146 at 18. Because the Court grants summary judgment on the merits, the Court need not reach the question of qualified immunity.

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.